IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

REBECCA A. VOLNY,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　Civil Action No.: __3:20cv870__

BERKLEY INSURANCE COMPANY,
   **SERVE:**    **Registered Agent**
                **CT Corporation System**
                **4701 Cox Road, Suite 285**
                **Glen Allen, VA 23060**

    Defendant.

**JURY TRIAL DEMANDED**

## COMPLAINT

The plaintiff Rebecca A. Volny (" Volny"), by counsel, for her Complaint against the defendant Berkley Insurance Company ("Berkley"), represents unto the Court as follows:

### INTRODUCTION

Volny brings this action for sex discrimination and retaliatory discharge from employment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-2 and 3.

The basis for her claim is that she was not promoted from assistant underwriter to underwriter, while less-qualified males were promoted ahead of her. Volny's employment was terminated after she complained to her manager of sex discrimination.

### THE PARTIES

1. Volny is a female residing in Henrico County, Virginia.

2. Berkley is a subsidiary of W.R. Berkley Corporation. It is a nation-wide provider of insurance services, claims handling and risk control solutions for nonprofit and for-profit social service and charitable organizations. Its corporate office is located at 475 Steamboat Road, Greenwich, Connecticut 06830. Volny worked for Berkley from an office located at 4820 Lake Brook Drive, Suite 300, Glen Allen, Virginia 23060, in Henrico County.

3. At all times during the events complained of herein, Berkley employed a sufficient number of individuals to be deemed a "respondent" for purposes of Title VII, as understood under 42 U.S.C. § 1981a(b)(3)(D).

## JURISDICTION AND VENUE

4. Jurisdiction over plaintiff's claims is based on 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(3) (violation of civil rights). Venue is proper in this District as it is the location of the plaintiff and the situs of the events complained of herein.

## ALLEGATIONS

5. Volny commenced employment with an affiliate of Berkley called Berkley Mid-Atlantic Group on or about June 4, 2012. She worked initially as a rater, someone who processes insurance endorsements and performs clerical back office work. Volny was promoted to underwriting analyst without a raise in October 2015, due to the former male analyst leaving.

6. In January 2016, Volny's title changed to assistant underwriter (same position different title) and she was transferred from Berkley Mid-Atlantic Group to Berkley. At the time of her termination Volny was earning $52,000 per year, plus fringe benefits.

7. During the course of her employment Volny received positive performance evaluations and was never disciplined for misconduct.

8. When Volny was initially hired by Berkley Mid-Atlantic Group, she was told that she would be promoted to underwriter within one to two years. In reality, however, Volny worked at

Berkley Mid-Atlantic Group for four years and Berkley Insurance Company for three and a half years and was never promoted to underwriter. A male assistant underwriter, however, with less experience than she had was promoted to underwriter during Volny's time with Berkley.

9. In early December 2015, Volny's department experienced massive staffing issues as the manager and two of the three underwriters quit. The last remaining underwriter that Volny assisted had a planned vacation and she had to manage the entire $14 million book of business alone, which she did successfully. This established that Volny was capable and ready to be promoted to underwriter. Later that month when Volny's new manager (Glena Matthews) and a new underwriter (Scott Swartz) were hired, Volny trained both of them on Berkley systems and guidelines.

10. By mid-2016, Volny asked Matthews about the possibility of being promoted to underwriter. Matthews advised that Berkley had no formal training program but stated that she would have Volny handle full insurance renewals and new business to gain experience. By the end of 2017, Volny was routinely handling full renewals and new business.

11. By this time Volny had been with Berkley-affiliated companies for five years, including two years with Berkley, without being promoted to underwriter despite frequently asking Matthews for the opportunity.

12. During this time frame, another male assistant underwriter with significantly less experience in underwriting (Jeremy Lewis) was promoted to underwriter, while Volny languished as an assistant underwriter.

13. In late 2017, Matthews told Volny that Berkley had an underwriter training program. Volny enrolled in it and completed the training in December 2018. Lewis had been given this

information significantly earlier than Volny had and entered and completed the class well before she did.

14. In January 2019, Matthews told Volny that no promotions to underwriting would occur due to budget constraints. A few underwriters brought up the possibility of Volny becoming an underwriter for insurance renewals. She approached Matthews about the idea in April and May 2019, but Matthews repeatedly dismissed the idea even though Volny was performing the job of a renewal underwriter without the title or pay, as renewals and new business were the majority of her workload.

15. Volny brought up the idea of potentially creating a position utilizing her skills since her ultimate goal was to move forward in her career. Matthews mentioned the possibility of a hybrid underwriter/operations position and told Volny she would speak with Berkley's Chief Underwriting Officer, Christopher Finkley, about the position. During this time Berkley created a position for a male IT helpdesk person, Andrew Lachance to teach him web application development, so it did not seem out of the realm of possibility.

16. Matthews advised Volny to create a position and that she would be given a platform with the Chief Operations Officer to present the idea. Volny excitedly created the job description and sent it to Matthews. Matthews told Volny that a meeting was arranged with the COO and the Supervisor of Operations. However, when the meeting occurred only the Supervisor of Operations was present on the call and he did not have any knowledge of the position Volny was supposed to be discussing.

17. When Volny later contacted Matthews to ascertain the source of the miscommunication, Matthews seemed nervous and advised Volny that there would have a meeting with her and Finkley. As soon as the call started, Finkley was very dismissive of

Volny's candidacy, exclaiming at one point: "Do you even know what it takes to promote change within an organization?" Volny responded by explaining in depth of her knowledge of the underwriting process (e.g., research, investigation, gathering information from stakeholders, developing a collaborative solution, considering legal and financial feasibility, cost benefit analysis, and the presentation of findings for final approval). At that, Finkley stammered and said, "Well yes, but there is more to it than that."

18. Volny then expressed her frustration with having invested six years with Berkley without a promotion. Finkley replied with concerns about budget restraints and said, "If you even think you are going to be promoted in the next one or two years, it's not going to happen."

19. Volny then asked Finkley how a position was created for Lachance and why Lewis had been promoted to underwriter when the company was undergoing a worse financial position at the time of his promotion. Volny also asked why she had not been promoted to underwriter for over seven years and remained just above entry level when Lachance and Lewis had been promoted sooner with significantly less experience. Finkley replied that technically she had only been with the company for three years as the prior four years performing underwriting services for a Berkley affiliate somehow did not count. Volny found this confusing as she had been assured when she arrived at Berkley that her tenure and position history would be recognized.

20. Volny also made Matthews aware that from the time that she started that she wanted to become an underwriter and had 14 years' of prior experience in the insurance industry at the time Volny was hired but was passed over for promotion over Lewis.

21. After that June 4, 2019 meeting, no further discussion occurred regarding Volny's development or advancement within Berkley and Finkley did not acknowledge or communicate with her at all again until her termination.

22. On October 2, 2019, Matthews issued Volny a Performance Improvement Plan (PIP) for lack of attentiveness at work. The PIP was filled with false information and was not justified by her performance. Volny was given a review date in the beginning of November for a re-evaluation.

23. Prior to issuing the PIP, Matthews had always praised Volny's performance, recognized her worth to Berkley and had frequently wanted to promote Volny to the position of underwriter. Upon information and belief, Matthews was pressured by Finkley to issue Volny the PIP in retaliation for complaining about her lack of promotion and implicit sex discrimination. The PIP was not justified by poor performance.

24. At that time, there were three underwriters and two assistant underwriters serving the underwriters. Volny was assigned to one underwriter (Terri Anne Kane), while the other assistant underwriter (Michael Berg) served underwriter (Scott Schwartz). The third underwriter (Jennifer Davis) funneled work to both Volny and Berg.

25. During the pendency of the PIP, Volny was suddenly given significantly more work to perform. She was given all of the work from the three underwriters. A rater (Megan Kuntz) who sat next to assistant underwriter Berg told Volny that Berg had essentially no work to perform, and asked, "Why is everything being sent to you when Mike doesn't have anything to do?" Volny was performing three times the amount of work she had handled before the PIP and before the meeting with Finkley when she complained of sex discrimination.

26. On October 10, 2019, just days into the PIP, Volny was accused by Matthews of having "poor desk management." This accusation was untrue. It was apparent that Berkley management was increasing pressure and piling on additional workload on Volny in the hope that she would resign. Volny told Matthews, "If the company is trying to fire me for quality or by

overloading me with work they need to find another reason because I have a high work ethic and I'll work until midnight if I have to." Volny spent several nights working until 9:00 pm or later.

27. On October 24, 2019, Volny told Matthews that the several items on the PIP were incorrect and that she had documented the discrepancies to show her. Matthews' reply was dismissive, saying "We will have to agree to disagree," and refused to review any of Volny's documentation.

28. On October 25, 2019, Volny's employment with Berkley was terminated. She was informed of the decision over the telephone by Matthews and Finkley. No Human Resources official was present, which is contrary to Berkley's customary practice and protocol for a termination of employment. When Volny attempted to explain to Finkley that the reason for termination was invalid he shouted Volny's name several times and said "We are not doing that! You are terminated as of today!"

29. Volny is aware of three female employees who were fired by Finkley and one who quit, while Finkley promoted and advanced male employees. She is also aware that Finkley paid male employees a higher salary for the same work that females were performing for less salary.

30. In all of the foregoing respects, Berkley violated Volny's rights to be free from sex discrimination and retaliation, in violation of her rights Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 and 3.

31. As a direct result of being discharged from her employment Volny lost a valuable opportunity for career advancement with Berkley. She has also suffered lost earnings, lost employment-related benefits, damage to her professional reputation, and she has suffered substantial emotional distress, humiliation and embarrassment.

32. Volny exhausted the remedies available to her by filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on or about August 4, 2020 alleging sex discrimination and retaliation. Volny received a Notice of Right to Sue (Issued on Request) from the EEOC dated August 25, 2020.

COUNT I
CLAIM FOR GENDER DISCRIMINATION
UNDER TITLE VII, 42 U.S.C. § 2000e-2

33. By discharging and subjecting Volny to discrimination in the terms and conditions of her employment on account of her female sex, and dismissing her from employment, as described herein, Berkley violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

34. Volny's injuries under this Count entitle her to reinstatement to her former position, and an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury to her future career; (d) punitive damages; (e) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

COUNT II
CLAIM FOR RETALIATORY DISCHARGE
UNDER TITLE VII, 42 U.S.C. § 2000e-3

35. By terminating Volny's employment in retaliation for complaining of sex discrimination, as described herein, Berkley has violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

36. Volny's injuries under this Count entitle her to reinstatement to her former position, and an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury

to her future career; (d) punitive damages; (e) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

WHEREFORE, the plaintiff Rebecca A. Volny demands an order reinstating her to her former position with defendant Berkley Insurance Company, and a judgment for compensatory and punitive damages in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00); plus attorney's fees, costs of suit, and such other and further relief as this Court may deem just and proper.

        Respectfully submitted,

        REBECCA A. VOLNY

        By: _____/s/_____
        Scott Gregory Crowley
        Virginia Bar No. 31216
        Attorney for Rebecca A. Volny
        Crowley & Crowley, P.C.
        4870 Sadler Road, Suite 300
        Glen Allen, VA 23060
        Tel.: (804) 205-5010
        Fax: (804) 205-5001
        scrowley@crowleyandcrowley.com